IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **RANDALL PETERSON,** | CASE NO. 1-22:CV:02300 |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| v. | |
| **OHIO STATE HIGHWAY PATROL,** *et al.* | **Memorandum of Opinion and Order** |
| Defendant. | |

**INTRODUCTION**

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 21). This is a reverse race discrimination case arising out of Plaintiff's termination from the Ohio State Highway Patrol. For the reasons that follow, the motion is GRANTED.

**FACTS**

Plaintiff Randall Peterson ("Plaintiff") filed a Complaint against Defendants Ohio State Highway Patrol Chardon Patrol Post 28, Ohio Department of Public Safety (the "Department"), and Ohio State Highway Patrol 1970 West Broad Street (collectively, "Defendants") asserting claims alleging wrongdoing in connection with the termination of his employment.

Plaintiff, who is Caucasian, began working with the Ohio State Highway Patrol ("Patrol") as a cadet in April 2002. Shortly thereafter, the Patrol promoted Plaintiff to trooper and assigned him to the Chardon Post, where he was stationed for approximately five years. Plaintiff then transitioned to working with the Patrol's Special Response Team ("SRT"), which did not require Plaintiff to be

stationed at any post. In September 2017, the Patrol promoted Plaintiff to sergeant and stationed him at the Ashtabula Post. In May 2018, the Patrol transferred Plaintiff back to the Chardon Post under the supervision of Lieutenant Lawrence Roberts, who is African American.

In 2017, before his transfer to the Chardon Post, Plaintiff sought to become co-owner of a tavern that holds a liquor license. On July 27, 2017, Plaintiff filled out an Application for Secondary Employment with the Department to request approval for the business venture. The Department denied his request on September 8, 2017, since the tavern is regulated by the Ohio Investigative Unit, which could present a conflict of interest. Plaintiff nonetheless moved forward with his plans for the tavern despite the Department's denial. In May 2018, Lieutenant Roberts learned of Plaintiff's ownership of the tavern as well as the denial of his Application for Secondary Employment.

On June 5, 2018, Sergeant David Zatvarnicky of the Administrative Investigation Unit, a separate unit of the Patrol's Office of Personnel, initiated an investigation into the matter. The investigation resulted in Plaintiff's termination in September 2018 for violation of two of the Department's rules and regulations. The Ohio State Troopers Association, a labor union that represents sergeants and troopers who work for the Patrol (the "Union"), grieved Plaintiff's termination and an arbitrator determined Plaintiff should be reinstated. Plaintiff was reinstated effective April 29, 2019, and the period between his termination and reinstatement was converted into a 216-day unpaid suspension, which was recorded on Plaintiff's disciplinary record. While Plaintiff disputes that the arbitrator intended to convert his termination into an active suspension, there is nothing in the record suggesting Plaintiff ever took issue with it appearing on his disciplinary record.

Sergeant Jeremy Kindler, who also worked for Lieutenant Roberts at the Chardon Post, testified that it was difficult to work for Lieutenant Roberts. Lieutenant Roberts created a lot of friction at the Chardon Post and handled issues with subordinates poorly. He never witnessed Lieutenant Roberts treating Caucasian employees differently than African American employees, but he seemed to have a better relationship with more senior employees. (Kindler Depo. 28:23 – 29:3; 74:14 – 23; 82:2 – 7.) Plaintiff testified that the morale at the Chardon Post deteriorated under Lieutenant Roberts' leadership. Plaintiff additionally testified that Lieutenant Roberts was friendlier with African American employees and that he was "coming for" Caucasian employees. (Plaintiff Depo. 25:24 – 27:4; 170:19 – 171:18.)

Eventually, Plaintiff complained to the Union President, Jeremy Mendenhall, about Lieutenant Roberts. (Declaration of Jeremy Mendenhall (Mendenhall Decl.) ¶ 4.) Mendenhall contacted Sergeant Kindler and Trooper Joe Sanfilippo, who also worked under Lieutenant Roberts, and both confirmed that "there was a rough and unpleasant atmosphere at Chardon Post" under Lieutenant Roberts' leadership. (*Id*. ¶ 6; Kindler Depo. 49:8 – 23.) Neither individual mentioned race or any race-based allegations in those conversations. (Mendenhall Decl. ¶ 6.)

At some point, Plaintiff, Sergeant Kindler, and Sergeant Ryan Pickett met with Union President Kari Root about the tense environment at the Post. (Kindler Depo. 44:14 – 46:16.) Sergeant Kindler testified that the sergeants discussed the hostile environment with Root, and Root directed them to compile supporting documentation to bring their allegations forward. (*Id*.) While Sergeant Kindler recalled that Plaintiff would serve as the point person for the collection of documents, Sergeant Kindler did not recall providing Plaintiff with any documentation to move forward with the Union. (*Id*.) The Union never filed a grievance. (Plaintiff Depo. 149:10 – 150:2.) There is no evidence

3

that the sergeants discussed race as a factor in the environment at the Post, either at this meeting or in any conversation with any other Union representative. (Kindler Depo. 108:24 – 110:11; Mendenhall Decl. ¶¶ 7 – 8; Declaration of Robert Cooper (Cooper Decl.) ¶¶ 4 – 5.) The Union does not have any documentation evidencing that Plaintiff pursued a complaint or grievance against Lieutenant Roberts relating to race-based disparate treatment, discrimination, or a hostile work environment. (Declaration of Larry Phillips (Phillips Decl.) ¶ 6.)

On September 17, 2020, Lieutenant Roberts placed Plaintiff on a Performance Improvement Plan ("PIP") for the period October 1, 2020 through January 1, 2021. (Doc.# 16-9, PageID## 465-469.) In the PIP, Lieutenant Roberts indicated that Plaintiff does not "lead[] by example" and "speaks with units about issues with the management team . . . [which] . . . lowers the morale at the post and starts conflict within." (*Id*., PageID# 468.) Plaintiff responded to Lieutenant Roberts' comments indicating "it is a known fact at Post 28 Lieutenant Roberts 'does not' want" him there, that Lieutenant Roberts is not trusted, and that 70% of the troopers at the post discussed the possibility of filing a hostile workplace claim. (*Id*.) Plaintiff did not mention any concern of hostile treatment toward him based on his race in the PIP. (Plaintiff Depo. 147:18 – 23.)

On March 19, 2021, Lieutenant Roberts emailed Plaintiff regarding a welcome home parade that would occur on April 3, 2021, for a student who had spent several months in the hospital. Lieutenant Roberts asked Plaintiff to "[p]lease assign a unit to handle [the] detail." Doc.#21-2, PageID # 1396.) Plaintiff failed to assign a unit as ordered. While he admitted to failing to carry out the order, he testified that he did not assign a unit to the detail because his guys were overworked and burned out. (Peterson Depo. 106:24-107:3; 108:2-6.)

Shortly after the parade, on April 7, 2021, the Chardon Post held a supervisor's meeting. Lieutenant Roberts and Plaintiff both attended, as well as Sergeant Ronald Bornino, Sergeant Pickett, Sergeant Kindler, and Captain Jeffery Greene, who was Assistant District Commander of the Warren District. At the meeting, Captain Greene recalled learning that Plaintiff failed to follow a directive. (Declaration of Jeffrey Greene (Greene Decl.) ¶ 14.) Captain Greene further recalled finding Plaintiff's explanation unacceptable and, following the meeting, he took the information to Captain Eric Sheppard, Warren District Commander. (*Id*. ¶¶ 14-15.) While Captain Greene could not initiate administrative investigations, he expressed his opinion to Captain Sheppard that an investigation should be initiated. (*Id*. ¶ 15.) Captain Greene was not aware of any race-based complaints by Plaintiff about Lieutenant Roberts at any time. (*Id*. ¶ 19.)

On April 16, 2017, Captain Sheppard informed Sergeant Zatvarnicky of the Patrol's Administrative Investigation Unit about the parade detail incident, and he conducted an administrative investigation. (Declaration of Aaron Williams ("Williams Decl.") ¶ 10.) Sergeant Zatvarnicky's investigation was then reviewed by the Professional Standards Unit, the Patrol's Office of Personnel, the Patrol's Office of the Colonel, and the Office of the Director of the Department of Public Safety. (*Id*. ¶¶ 12,14.)

Assistant Director of the Department, Karen Huey, was the final decision-maker with respect to Plaintiff's discipline. (Declaration of Karen H. Huey ("Huey Decl.") ¶ 12.) Following her review, and consistent with progressive discipline, Huey approved the recommendation that Plaintiff be offered a Last Chance Agreement in lieu of termination, which would require his demotion and transfer to a different post. (*Id*. ¶¶ 12, 14-16.) Huey's review included Plaintiff's 2018 termination and reinstatement. (*Id*. ¶ 16.) Huey considered the 216-day unpaid suspension, which was still active

5

on Plaintiff's record, a "significant factor" in making the decision to terminate Plaintiff if he did not accept the Last Chance Agreement. (*Id.*)

Plaintiff rejected the Last Chance Agreement and was terminated on July 28, 2021, for failing to comply with a supervisor's order. (Greene Decl. ¶ 19; Doc.# 16-25, PageID# 539.) Thereafter, the Union filed a grievance, but an arbitrator upheld Plaintiff's termination. On May 2, 2022, Plaintiff filed a charge of discrimination with the EEOC and OCRC and received a Notice of Right to Sue on September 22, 2022. Thereafter, he initiated this case against Defendants.

The Complaint contains two claims for relief: (1) a claim for race-based discrimination under Title VII;[1] and (2) a claim for retaliation.[2] Defendants move for summary judgment and Plaintiff opposes the motion.

## **STANDARD**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-

---

[1] Count I is treated as a wrongful termination claim arising under Title VII. Although the claim mentions hostile work environment, Plaintiff makes no mention of this aspect of the claim in his briefing. "[T]o establish a prima facie case of hostile work environment based on race under Title VII, a plaintiff must show: 1) that he is a member of a protected class; 2) that he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability. *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). In cases of reverse race discrimination where the plaintiff is a member of the majority, the first prong is altered to require the plaintiff "to prove background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). To the extent Plaintiff seeks to assert a claim for hostile work environment based on race, the evidence proffered falls far short of what is required.

[2] Defendants move for summary judgment on Counts I and II. In his opposition, Plaintiff indicates he has abandoned Count II.

23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable"

and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**DISCUSSION**

"The general standard for establishing a *prima facie* case in disparate treatment cases under Title VII is set forth in the seminal racial discrimination in hiring case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 66 (6th Cir. 1985). "[T]his standard provides an analytical framework which should be modified to accommodate different employment discrimination contexts," including discrimination in "promotion, firing, compensation or other conditions of employment." *Id*.

In cases of "reverse race discrimination," where the plaintiff is a member of the majority, a *prima facie* discrimination claim under the modified *McDonnell Douglas* framework requires the plaintiff to show: "(1) that the defendant is that unusual employer who discriminates against the majority; (2) that she was qualified for the position in question; (3) that she suffered an adverse employment action; and (4) that she was treated differently than other similarly situated employees." *Treadwell v. Am. Airlines, Inc.*, 447 F. App'x 676, 678 (6th Cir. 2011) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603–04 (6th Cir.2008)).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action at issue. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citation omitted). If the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. *Id*. "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted

8

justification is false, may permit" a finding of unlawful discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Defendants argue they are entitled to summary judgment because Plaintiff cannot establish the first and fourth elements of his claim. Further, Defendants argue that even if Plaintiff could establish the elements of his reverse race discrimination claim, a legitimate, nondiscriminatory business reason exists for his termination, namely his failure to follow his supervisor's order. Finally, Defendants argue that Plaintiff cannot produce evidence sufficient to establish that Defendants' proffered reason for his termination is pretextual.

Plaintiff argues that summary judgment is not appropriate. He claims that the first element of his reverse race discrimination claim is met in two ways. First, Plaintiff argues that a Spring 2021 Patrol publication called *The Flying Wheel* is evidence of Defendants' organizational preference for establishing a diverse group of employees. Second, Plaintiff argues that Defendants treated African American employees differently than Plaintiff. Plaintiff further claims the fourth element of his reverse race discrimination claim is satisfied because three African American lieutenants were punished less severely than Plaintiff for what Plaintiff characterizes as comparable conduct. Finally, Plaintiff contends that Defendants' proffered reason for terminating Plaintiff is pretext for discrimination.

Upon review of the parties' arguments, the Court agrees with Defendants that Plaintiff does not establish a genuine issue of material fact as to any element of his claim for reverse race discrimination.

A. **Plaintiff's *Prima Facie* Burden**

The parties do not dispute that the second and third prongs of the *McDonnell Douglas* test are met. This case rests upon the first and fourth prongs of the *prima facie* case: whether Plaintiff has shown that Defendants are that unusual employer who discriminates against the majority, and whether Defendants treated Plaintiff differently than similarly situated non-white employees. Therefore, the Court will examine only the first and fourth prongs of the test.

1. **First Prong**

A plaintiff satisfies the first prong of the *prima facie* case by "demonstrat[ing] background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (citations omitted). Plaintiff argues that the background circumstances prong is met in two ways: 1) *The Flying Wheel* publication, and 2) a practice within the Patrol of more lenient treatment of African American employees.

   a. <u>*The Flying Wheel* Publication</u>

In Spring 2021, the Patrol released a publication of *The Flying Wheel*. (Doc.# 16-33, PageID## 601-628.) The publication included a statement by Colonel Richard S. Fambro, an African American. In the "Colonel's Letter," under the subheading "Workforce Retention," Colonel Fambro discussed the importance of recruiting and retention to secure the success of the Patrol. The statement provides:

> Putting a focus on protected classes is very important in terms of both recruitment and retention. A lot [of] people may not want to hear that because they think as a black Colonel my focus is trying to make things easy for minorities and I am going to lower the standards. That could not be further from the truth. We have to, as best we can, mirror the state that we serve. . . . When I was named superintendent, promoting qualified and deserving minorities and females was a priority.

The publication then goes on to discuss a new website designed to attract minority and female recruits and identifies recruitment efforts targeting specific community and faith-based organizations, including the NAACP, Urban League, Asian festivals, women's events, YMCAs and YWCAs, and historically black colleges.

Citing *Sampson v. Secretary of Transportation*, 1999 WL 455399 (6th Cir. June 23, 1999), Plaintiff argues that Colonel Fambro's statements "expressed an organizational preference for promoting minorities" and "resulted in Caucasian Sergeants and Troopers expressing grave concern that Col. Fambro was going to favor qualified minority candidates over qualified Caucasian candidates for promotion." (Opp. at 15.) When asked how Colonel Fambro fostered and condoned race-based disparate treatment at the Chardon Post, Plaintiff referenced his statements in *The Flying Wheel* article and testified he interpreted Colonel Fambro's statement as "he is going to replace the white supervisors." (Plaintiff Depo. 182:11-19.)

Plaintiff is correct that the background circumstances prong may be met where there is evidence of "organizational preference for establishing a diverse group of employees." *Sampson*, 1999 WL 455399, *1.  However, for an organizational preference to create the background circumstances necessary to support a reverse race discrimination claim, there must also be evidence that the employer relied on the organizational preference in carrying out the adverse employment action.  *Id*.; *see also Grindstaff v. Sun Chem. Corp.*, 2010 WL 4878953, at *11 (S.D. Ohio Nov. 22, 2010) (interpreting *Sampson* to require "evidence that the employer had policies reflecting 'an organizational preference for establishing a diverse group of employees' *and* evidence suggesting that the defendant had relied on these diversity policies in carrying out the adverse employment action).

11

Apart from Plaintiff pointing out that Colonel Fambro's statements in *The Flying Wheel* occurred around the time he was terminated, there is no evidence in the record that would establish that Defendants relied on any diversity policy when determining the appropriate discipline for Plaintiff's conduct. Quite the opposite. Huey, who is also Caucasian, was the final decision-maker with respect to Plaintiff's discipline. (Huey Decl., ¶ 12, 17.) Huey was not aware of Plaintiff's race or ethnicity at the time she made the decision to offer him a Last Chance Agreement. (*Id*. ¶ 20.)

Here, the Court finds that Colonel Fambro's statements in *The Flying Wheel* alone, without evidence that Defendants relied upon those statements in determining Plaintiff's discipline, do not create the background circumstances necessary to support a reverse race discrimination claim. Moreover, the decision-maker was Caucasian. *Nelson v. Ball Corp.*, 656 F. App'x. 131 (6th Cir. 2016).

   b. More Lenient Treatment of African American Employees

Plaintiff next argues that the background circumstances prong is satisfied in this case because Defendants have a history of more lenient treatment of African American employees.

Plaintiff points to three African American employees who he claims were treated more leniently for comparable conduct than himself and another Caucasian employee, Lieutenant Brett Henderson. According to Plaintiff, Lieutenant Brett Henderson, who is also Caucasian, "lied about his weight and was terminated." (Opp. at 12.) However, Lieutenant Carlos Smith, Lieutenant Durant, and Lieutenant Roberts committed comparable misconduct but received a less severe punishment. (*Id*.)

With respect to Lieutenant Smith, Plaintiff argues he attempted to drown his wife in their pool, threatened self-harm with his duty weapon, and was not truthful with police investigating the

incident, but he was only demoted to sergeant for this misconduct. Lieutenant Durant claimed overtime pay for work he never performed and was only docked one week of pay, keeping his rank. Plaintiff argues Lieutenant Roberts had a more extensive discipline history, including a one-day suspension for releasing a sergeant's personal health information, a three-day suspension for making untruthful statements to a subordinate, and most recently on July 25, 2021, a demotion for failing to file a minor misdemeanor citation in court and failing to seize and charge for a firearm discovered in a traffic stop. (Opp. 10 – 12.)

Plaintiff does not provide the Court with any sufficient evidence to properly weigh his argument. Particularly with Lieutenants Henderson, Smith, and Durant, the Court does not have any information about their supervisors at the time of their misconduct, their previous disciplinary histories, the results of any investigations into their misconduct, rule violations they committed, or, in the cases of Lieutenants Roberts and Smith, whether they were offered alternatives similar to a Last Chance Agreement prior to their demotions. Plaintiff does not even provide the Court with Lieutenant Durant's first name. Although Lieutenant Robert's disciplinary record is available for the Court to review, much of the necessary information is still lacking. All that the Court can determine is that Lieutenant Roberts was demoted around the same time that Plaintiff was offered a Last Chance Agreement, which would have similarly resulted in his demotion had he accepted it.

For these reasons, the Court finds that a comparison of Plaintiff and Lieutenant Henderson's disciplinary histories with those of Lieutenants Roberts, Smith, and Durant is not the background circumstances necessary to support a reverse race discrimination claim.

Thus, the Court finds that Plaintiff has failed to offer evidence sufficient to create a genuine issue for trial on the first prong of his *prima facie* case of reverse race discrimination.

### 2. Fourth Prong

"Where a plaintiff is unable to satisfy the first prong of the *prima facie* case of employment discrimination, the Court is not required to reach the [remaining] steps of the *McDonnell Douglas* burden-shifting framework." *Ames v. Dep't of Youth Servs.*, 2023 WL 2539214, at *9 (S.D. Ohio Mar. 16, 2023) (citing *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 256–57 (6th Cir. 2002) (granting summary judgment where plaintiff failed to demonstrate background circumstances supporting the suspicion that defendant is that unusual employer who discriminates against the majority). Here, because Plaintiff cannot meet the first prong of the *McDonnell Douglas* test, the Court need not consider whether the fourth prong is satisfied. Nevertheless, the Court finds Plaintiff does not present evidence sufficient to create a genuine issue of material fact as to prong four.

The fourth prong of the *prima facie* case requires Plaintiff to show that he "was treated differently than similarly situated employees of a different race." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012). Employees may be considered similarly situated if a plaintiff can prove that all of the relevant aspects of his employment situation are nearly identical to those of the employees who he alleges were treated more favorably." *Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 325 (6th Cir. 2001). Here, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated. *Campbell*, 23 F. App'x at 325 (6th Cir. 2001).

Plaintiff, relying on the examples of Lieutenants Roberts, Smith, and Durant, does not present evidence sufficient to create a genuine issue of material facts regarding whether Defendants treated

14

similarly situated African American employees differently than they treated him. As discussed above, the Court does not have any information regarding whether these lieutenants are similarly situated in all relevant respects to determine whether they could serve as appropriate comparators for Plaintiff. With respect to Lieutenants Durant and Smith, the only evidence Plaintiff provides the Court is his own deposition testimony. (Opp. at 12 – 13.) From the evidence – or lack thereof – provided, the Court cannot determine their job responsibilities, their work histories and experiences, or their disciplinary histories. "Without a showing that all of the relevant aspects of his employment situation are 'nearly identical' to those of the minority employees who he alleges were treated more favorably," Plaintiff does not create a genuine issue of material fact sufficient to survive summary judgment.[3] *Cooper v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 954 (W.D. Tenn. 2010) (citations and alterations omitted).

The Court finds that Plaintiff does not set forth sufficient facts to establish his *prima facie* case under either the first or fourth prong of the *McDonnell Douglas* framework.

### B. Defendants' Legitimate, Non-discriminatory Reason for Plaintiff's Termination

"If plaintiff creates a *prima facie* case of discrimination, the burden shifts to defendant to proffer a legitimate, non-discriminatory reason for plaintiff's rejection. The burden then shifts back to plaintiff to demonstrate that the offered legitimate reasons are pretextual." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255–56 (6th Cir. 2002) (citation omitted). As Plaintiff "did not establish

---

[3] Defendants argue that "because of their unique status in the workplace, bargaining unit employees are never similarly situated with non-bargaining unit employees." *Davis v. Ineos ABS (USA) Corp.*, 2011 WL 1114409, at *3 (S.D. Ohio Mar. 24, 2011) (citing *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1170 (11th Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988)). The Court does not have sufficient evidence to determine whether Plaintiff is similarly situated to the comparators on this basis.

a prima facie case of discrimination, this Court need not reach the further questions of pretext involved in the *McDonnell Douglas* balancing framework." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 917 (6th Cir. 2013).

Even if Plaintiff had met his *prima facie* burden, Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's termination. Defendants "need not prove a nondiscriminatory reason for" Plaintiff's termination, "but need merely *articulate* a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (emphasis in original).

Defendants have articulated a valid rationale for Plaintiff's discipline: Plaintiff failed to carry out a supervisor's order by not assigning a unit to the parade detail. Importantly, Plaintiff admitted to understanding his supervisor's order but chose not to follow it. Defendants assigned Sergeant Zatvarnicky to investigate Plaintiff's conduct, and his investigation was reviewed by several individuals. Ultimately, taking into consideration the results of the investigation and Plaintiff's prior discipline, Huey determined that a Last Chance Agreement was appropriate for Plaintiff.

Further, as Defendants point out in their motion, "[w]hile the outcome of an arbitration decision in favor of the employer is not dispositive in a Title VII suit of whether there was discrimination, . . . an arbitration decision in favor of the employer is sufficient to carry the employer's burden of articulating some legitimate, nondiscriminatory reason for the employee's rejection." *Jasany v. U.S. Postal Serv.*, 755 F.2d 1244, 1252 (6th Cir. 1985) (citations and alternations omitted). It is undisputed that the Union filed a grievance regarding Plaintiff's termination, the grievance proceeded to arbitration, and an arbitrator upheld Plaintiff's termination.

Here, even assuming Plaintiff established a *prima facie* case of discrimination, the Court finds that Defendants have carried their burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination.

### C. Pretext

Additionally, Plaintiff does not point to evidence sufficient to create a question of fact as to whether Defendants' proffered reason is pretextual.

"A plaintiff may establish pretext by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action. *Waters v. Drake*, 222 F. Supp. 3d 582, 601 (S.D. Ohio 2016) (citing *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)).

Here, Plaintiff must "produce sufficient evidence from which a jury could reasonably reject Defendant's explanation of why" Plaintiff was terminated. *Fitters v. McDonough*, 2023 WL 2431768, at *3 (S.D. Ohio Mar. 9, 2023) (citations and alterations omitted). "This is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id*. "And ultimately, this burden merges with Plaintiff's overall burden of proving discrimination." *Id*.

Plaintiff argues that Defendants' proffered reason for his termination is pretextual in three ways. First, Plaintiff argues that at the time of his termination, he was engaging in protected activity, *i.e.*, pursuing a hostile work environment claim against Defendants. Second, Plaintiff argues Lieutenant Roberts orchestrated Plaintiff's termination. Third, Plaintiff argues pretext is evident given the disparate treatment of Caucasian and African American employees within the Patrol. The Court finds the evidence insufficient to establish a question of fact as to pretext.

First, there is no evidence that Plaintiff was pursuing a hostile work environment claim at the time of his termination. With respect to Plaintiff's PIP wherein he responded to Lieutenant Roberts' comments indicating that most of the troopers at the Post were talking about filing a "hostile work place" claim, there is no evidence that Plaintiff, let alone any of the troopers he intended to reference in his comments, ever actually pursued a hostile work environment claim against Defendants. Similarly, while Sergeant Kindler testified there was discussion between some of the sergeants with District Captain Sheppard about Lieutenant Roberts' behavior, there is no evidence that any of the sergeants pursued a hostile work environment claim after Captain Sheppard allegedly brushed them off.[4] (Kindler Depo. 38:18 – 41:12.) Sergeant Kindler testified that while he, along with Plaintiff and other employees, met with the Union to discuss a possible hostile work environment claim, he could not recall whether there was any follow up with the Union, which was Plaintiff's responsibility. (*Id.* 44:14 – 46:16.) Finally, Huey was not aware of Plaintiff's complaints against Lieutenant Roberts at the time she determined Plaintiff's discipline. (Huey Decl. ¶¶ 17, 20.)

Second, there is no evidence in the record that Lieutenant Roberts orchestrated the investigation into Plaintiff's misconduct. The evidence presented shows that Staff Lieutenant Greene made Captain Sheppard aware of the Plaintiff's failure to follow his supervisor's order, and Captain Sheppard initiated the investigation. (Green Decl. ¶¶ 15 – 17.) Although Plaintiff argues that "the District and Columbus" knew of his complaints against Lieutenant Roberts, he has not identified any evidence to support that assertion.

---

[4] Sergeant Kindler also testified that at this meeting between the sergeants and District Captain Sheppard, who is also Caucasian, no party made complaints of a hostile work environment based on race. (Kindler Depo. 115:19 – 116:7.)

Third, as previously discussed in this opinion, Plaintiff fails to point to evidence sufficient to create a question of fact regarding the similarly situated prong of the *prima facie* case. For the reasons stated above, Plaintiff also fails to create a question of fact regarding "disparate treatment" under the guise of pretext.

Plaintiff fails to cite to evidence that would create a genuine issue of material fact as to whether Defendants' legitimate, non-discriminatory reason is pretextual.

### D. Cat's Paw Theory of Liability

Plaintiff argues that there is a genuine issue of material fact as to whether Defendants should be held liable for his termination under the cat's paw theory of liability. Plaintiff argues that even if Lieutenant Roberts was not involved in the recommendation, investigation, or decision-making with respect to his termination, there is evidence that Lieutenant Roberts' discriminatory animus influenced Huey's decision-making.

For Plaintiff to be successful on a cat's paw theory of liability, he "must show: (1) a supervisor motivated by discriminatory animus; (2) who intended to cause an adverse employment action; and (3) proximately caused the adverse employment action." *Waters v. Drake*, 222 F. Supp. 3d 582, 603 (S.D. Ohio 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S.Ct. 1186). Further, "a plaintiff must show that the decisionmaker relied on discriminatory information from the biased supervisor." *Goodsite v. Norfolk Southern Ry.*, 573 F. App'x 572, 586 (6th Cir. 2014). "If the ultimate decision was based on an independent investigation and the plaintiff cannot establish that the supervisor's discriminatory animus influenced the decision, there is no causal connection." *Id*.

Plaintiff does not point to any evidence to establish a cat's paw theory of liability. Instead, Plaintiff argues that there was an incomplete investigation into his misconduct because Huey and

Sergeant Zatvarnicky did not have information from anyone with knowledge of Plaintiff's complaints against Lieutenant Roberts. However, Plaintiff was interviewed by Sergeant Zatvarnicky as part of the investigation and Plaintiff never mentioned Lieutenant Roberts' supposed racial animus as the impetus for the investigation into his misconduct. (Doc.# 21-2, PageID## 1381 – 1385.)

Moreover, as previously discussed, the evidence available demonstrates that Lieutenant Roberts did not initiate the investigation into Plaintiff's misconduct, did not recommend an investigation, and was not involved in determining Plaintiff's discipline. (Declaration of Larry Roberts ¶¶ 9, 13 – 14.) Captain Greene, who brought Plaintiff's misconduct to Captain Sheppard's attention, was not aware of any racial tension between Plaintiff and Lieutenant Roberts. (Greene Decl. ¶ 19.) Huey, who made the final determination as to Plaintiff's discipline, was not aware of Plaintiff or Lieutenant Roberts' race or any of Plaintiff's alleged complaints at the time of her decision. (Huey Decl. ¶¶ 19 – 20.) Simply put, there is no evidence that any alleged discriminatory animus on the part of Lieutenant Roberts proximately caused the adverse employment action at issue.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.

Date:  November 20, 2023

PATRICIA A. GAUGHAN
United States District Judge